UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JOHN A. JOSEPH, IV<br>(Social Security No. XXX-XX-5795), | )<br>)<br>) | |
| Plaintiff, | )<br>) | |
| v. | )<br>) | 2:11-cv-25-WGH-JMS |
| MICHAEL J. ASTRUE, Commissioner of<br>Social Security Administration, | )<br>)<br>)<br>) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7, 9) and an Order of Reference entered by District Judge Jane Magnus-Stinson on April, 11, 2011 (Docket No. 12).

### I. Statement of the Case

Plaintiff, John A. Joseph, IV, seeks judicial review of the final decision of the agency, which found him not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. § 404.1520(f). This court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB on September 14, 2006, and SSI on January 8, 2007, alleging disability since August 16, 2006. (R. 103-11). The agency denied

Plaintiff's application initially, and there was no need for a reconsideration of the initial decision because Plaintiff's claim was reviewed under a prototype disability determination. (R. 15, 45-48). Plaintiff appeared and testified at a hearing before Administrative Law Judge Troy M. Patterson ("ALJ") on December 10, 2008. (R. 23-43). Plaintiff was represented by an attorney. Also, testifying was Plaintiff's mother; a vocational expert appeared but did not testify. (R. 23). On January 15, 2009, the ALJ issued his opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy. (R. 15-22). After Plaintiff filed a request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on February 1, 2011, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Born on March 31, 1985, Plaintiff was 23 years old at the time of the ALJ's decision, with at least a high school education. (R. 21). His past relevant work experience included work as a lumber handler, cook and server, bartender, and telemarketer. (R. 21).

### B. Medical Evidence

#### 1. Plaintiff's Impairments

On August 17, 2006, Plaintiff presented to John Anderson, M.D., an orthopedic surgeon, with complaints of persistent pain in his right hip with

activity. (R. 171). Upon physical examination, Dr. Anderson noted that Plaintiff had some limitation in range of motion of the hip and pain with internal rotation. (R. 171). Dr. Anderson explained that an x-ray of Plaintiff's right hip revealed evidence of avascular necrosis[1] with joint space collapse. (R. 171). At that time, Dr. Anderson recommended that Plaintiff perform a "sit down job." (R. 171).

On August 23, 2006, an MRI of Plaintiff's hips confirmed avascular necrosis of the right femoral head, but there was no evidence of avascular necrosis of the left femoral head. (R. 175-76).

On August 29, 2006, Plaintiff was referred to Mark R. Wilson, M.D., an orthopedic surgeon, for an evaluation of his right hip pain and treatment options. (R. 182-84). Plaintiff reported that he experienced pain in his hip that radiated towards his knee. (R. 182). Upon physical examination, Dr. Wilson noted that Plaintiff ambulated fairly well, although he was somewhat antalgic, favoring his right hip. (R. 182). Dr. Wilson noted that Plaintiff had slightly decreased rotational motion of the right hip, but that he had intact motor functions in both his feet and legs. (R. 182). Based on the diagnostic tests and physical examination, Dr. Wilson diagnosed Plaintiff with avascular necrosis in the right hip. (R. 183). Dr. Wilson recommended that Plaintiff undergo vascularized fibular grafting surgery, which he believed offered Plaintiff a reasonable opportunity to heal his lesion, provide satisfactory pain relief, and

---

[1]Avascular necrosis, also known as osteonecrosis, is a disease resulting from the temporary or permanent loss of blood supply to the bones. Without blood, the bone tissue dies, and ultimately the bone may collapse, which can lead to pain and arthritis. If the process involves the bones near a joint, it often leads to collapse of the joint surface.

prevent the need for a hip replacement. (R. 183). Plaintiff indicated that he was interested in pursuing the recommended surgical intervention. (R. 184). In the meantime, Dr. Wilson suggested that Plaintiff may want to use crutches in order to keep his weight off his right hip, which Dr. Wilson believed might help control Plaintiff's pain symptoms. (R. 184).

On October 12, 2006, Plaintiff underwent right hip surgery, which included a right hip vascularized fibular graft to the femoral head, excision of the necrotic lesion femoral head with bone grafting, and placement of an internal bone stimulator. (R. 191-94).

On October 24, 2006, Plaintiff presented to Dr. Wilson for a follow-up examination twelve days after his surgery. (R. 180-81). Plaintiff remained non-weight bearing and his family confirmed that he was being compliant. (R. 180). X-rays of Plaintiff's right hip showed satisfactory position and alignment of the fibula graft into the femoral head, with no sign of any progressive collapse from his preoperative status. (R. 180). At that time, Dr. Wilson indicated that he was satisfied with Plaintiff's postoperative course. (R. 180). Dr. Wilson told Plaintiff that it would likely be a year or two before he was able to be a reasonable candidate to return to any unrestricted type of work. (R. 180). Plaintiff was prescribed a wheelchair. (R. 180).

On October 26, 2006, Dr. Wilson completed a Medical Examination Report for the Michigan Department of Human Services. (R. 249-50). Dr. Wilson noted that Plaintiff had been diagnosed with avascular necrosis, a painful progressive condition. (R. 249). Dr. Wilson indicated that Plaintiff was temporarily disabled

and was expected to return to work within one to two years. (R. 250). Dr. Wilson opined that Plaintiff could never lift and/or carry less than 10 pounds and was unable to stand, walk, or sit. (R. 250). Dr. Wilson indicated that Plaintiff would be on crutches for several months in order to allow his hip graft to heal. (R. 250).

On January 29, 2007, a physical therapy treatment note indicated that Plaintiff was able to walk with an antalgic gait and/or the use of one crutch. (R. 334). Walking or standing for more than 30 to 45 minutes increased his pain. (R. 334).

On February 20, 2007, Plaintiff presented to Dr. Anderson with complaints of right knee pain with activity. (R. 324). Dr. Anderson's physical examination revealed full range of motion in his right knee, with patellofemoral crepitus upon knee extension. (R. 324). An x-ray of Plaintiff's right knee revealed a well-centered patella in good position. (R. 324). Dr. Anderson recommended that Plaintiff obtain an MRI of his right knee; however, it was later noted that he was unable to do so because of the bone stimulator device in his hip, and a knee brace was prescribed instead. (R. 324-25).

On March 13, 2007, Plaintiff continued to experience pain in his right knee with exercise. (R. 326). Dr. Anderson recommended that Plaintiff undergo right knee arthroscopy and lateral release. (R. 326).

Later that month, on March 20, 2007, Plaintiff underwent right knee arthroscopic surgery. (R. 252-53). Dr. Anderson reported that his examination

of Plaintiff's right knee did not reveal any evidence of degenerative changes or ligamentous injury. (R. 252).

Following Plaintiff's surgery, on March 27, 2007, Dr. Anderson recommended that he gradually increase activity as tolerated. (R. 327). Dr. Anderson also recommended that Plaintiff discontinue the use of his crutch. (R. 327).

On April 6, 2007, a physical therapy note indicated that Plaintiff was able to walk with an antalgic gait, favoring his right side. (R. 310).

On April 24, 2007, Plaintiff presented to Dr. Anderson for a follow-up examination. (R. 328). Plaintiff reported that his pain symptoms were substantially improved after his lateral release surgery. Dr. Anderson noted that Plaintiff was ambulatory without his cane. Dr. Anderson recommended that Plaintiff gradually increase activity as tolerated. (R. 328).

On June 22, 2007, Plaintiff reported to the hospital with complaints of significant hip pain, which he rated a ten on the pain scale. (R. 256-64). Plaintiff reported that he had been doing reasonably well and was feeling good enough to play basketball a few days earlier, but that he subsequently developed throbbing pain in his hip. (R. 256). The pain worsened with sitting or standing. (R. 258). Plaintiff also reported that he had been able to walk his dog prior to this worsening in his pain symptoms. (R. 257). Upon physical examination, it was noted that Plaintiff walked with a marked limp and was unable to bear weight without support. (R. 258).

On July 17, 2007, Jack Carmen, M.D., an internal medicine specialist, completed a form that indicated that Plaintiff required a single crutch to ambulate. (R. 336). Plaintiff could lift and/or carry up to ten pounds occasionally. (R. 336).

On August 14, 2007, Plaintiff presented to Michael A. Masini, M.D., an orthopedic surgeon, for a consultation regarding complaints of pain and catching in the right hip area. (R. 360-62). Plaintiff reported that he experienced pain when he lunges, strides, or squats. (R. 360). He reported that he was unable to run, jump, or do anything athletic. (R. 360). Plaintiff reported that he enjoyed walking his dog, but that he was unable to do more than that due to his hip pain. (R. 360). Upon examination, Dr. Masini noted that Plaintiff had a significant antalgic gait, favoring the right side. (R. 360). Plaintiff reported that he experienced pain with flexion and attempts at rotation, abduction, and adduction of the right hip. (R. 361). An x-ray of Plaintiff's pelvis revealed evidence of osteonecrosis in the right hip with some subchondral collapse despite the fibular graft. (R. 373). The x-ray also revealed evidence of an anterior bony osteophyte. (R. 373). Dr. Masini recommended arthroscopic surgery in order to evaluate the status of the joint and debride the osteophyte, which might provide him with some symptomatic relief. (R. 362).

On September 18, 2007, Plaintiff presented to Dr. Masini with continued complaints of hip pain and catching. (R. 357). Dr. Masini's physical examination revealed reduced range of motion in Plaintiff's hip. (R. 357). Dr. Masini scheduled Plaintiff for arthroscopic surgery and debridement of a spur.

(R. 357). On September 27, 2007, Plaintiff underwent right hip arthroscopic surgery with debridement. (R. 354-56).

On October 23, 2007, Elizabeth W. Edmond, M.D., conducted a consultative medical examination of Plaintiff. (R. 342-44). Plaintiff reported that he suffered from right hip and right knee pain. (R. 342). Plaintiff reported that he did not drive, and that he used a shower chair to take showers. (R. 342). Upon examination, Dr. Edmond noted that Plaintiff was non-weight bearing on his right leg and was using crutches to ambulate. (R. 343). Dr. Edmond reported that Plaintiff had limitation of range of motion of the right hip associated with apprehension and local pain, muscle atrophy of the right calf, and decreased muscle strength in his right leg. (R. 343). Dr. Edmond noted that Plaintiff had some apprehension with movement of his right knee, with some limitation of range of motion. (R. 343). Based on her examination, Dr. Edmond diagnosed Plaintiff with post-surgical procedure on right knee (apparently internal derangement); post-surgical procedure of the right hip with diagnosis of avascular necrosis; depression/anxiety; and history of psoriasis. (R. 344).

On October 31, 2007, Plaintiff told Dr. Masini that his hip was a little bit better than it was previously. (R. 280-81). Dr. Masini noted that Plaintiff still walked with a significant limp and was unable to put much weight on his leg. (R. 280). Dr. Masini talked with Plaintiff about resurfacing versus hip replacement. He noted that he was hopeful that Plaintiff could get another

15-20 years out of a resurfacing procedure before a hip replacement was necessary, but also warned that hip replacement might be the only option. (R. 280).

On January 31, 2008, Plaintiff underwent hip resurfacing surgery due to osteonecrosis of the right hip and failed fibular grafting. (R. 290-92). The record reflects that Plaintiff tolerated the procedure well. (R. 291).

On February 22, 2008, Plaintiff presented to Dr. Masini for a follow-up examination following his hip resurfacing surgery. (R. 349). Plaintiff reported that he was still experiencing some soreness in his right hip, but that his pain symptoms were getting a little better all the time. (R. 349). Dr. Masini noted that Plaintiff walked with a limp, but that he did not require any assistive device to ambulate. (R. 349). He noted that Plaintiff was fairly comfortable with range of motion of the hip. (R. 349). An x-ray of Plaintiff's right hip revealed a well-positioned resurfacing component. (R. 365). Dr. Masini indicated that Plaintiff was really doing quite well at that time. (R. 349).

On April 23, 2008, Plaintiff presented to Dr. Masini for a follow-up examination three months after his right hip resurfacing surgery. (R. 347). Plaintiff stated that he was very happy with how he felt at that time. (R. 347). Plaintiff reported that he was walking, that he was active, and that he was golfing. (R. 347). Plaintiff stated that he was having no problems at all with his hip. (R. 347). Upon examination, Dr. Masini noted that Plaintiff had excellent motion in his hips and was doing well. (R. 347). An x-ray of Plaintiff's hips

revealed a well-positioned resurfacing component, with no signs of complicating process. (R. 364).

On December 10, 2008, Dr. Masini completed a form concerning Plaintiff's functional limitations. (R. 389-93). He reported that Plaintiff did not experience extraordinary pain secondary to his osteonecrosis of the hip at that time. (R. 389). He indicated that Plaintiff had been unable to work since the onset of his osteonecrosis. (R. 390). Dr. Masini opined that Plaintiff could lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk for one and one-half hours in an eight-hour workday, and sit for about two hours in an eight-hour workday. (R. 390, 392). Dr. Masini indicated that Plaintiff would occasionally need to use a cane in order to ambulate. (R. 391).

### 2. State Agency Review

On November 13, 2006, Rebecca Vanderwarker, M.D., completed a Physical Residual Functional Capacity Assessment. (R. 199-206). She opined that Plaintiff could occasionally lift 20 pounds and frequently lift ten pounds. (R. 200). He could stand, sit, and walk for six hours each in an eight-hour workday. (R. 200). Plaintiff could only occasionally crawl or climb ladders, ropes, or scaffolds, but otherwise had no postural limitations. (R. 201). She also opined that Plaintiff should avoid all hazards such as dangerous machinery or heights. (R. 203). Dr. Vanderwarker based her opinions on the medical records from Dr. Wilson and Dr. Anderson. (R. 201).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *see also Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson*, 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

### IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social

Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his/her past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through June 30, 2008; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 17). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had one impairment that is classified as severe: avascular necrosis. (R. 17). The ALJ concluded that this impairment did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible. (R. 19-21). Consequently, the ALJ concluded that Plaintiff retained the RFC for a full range of sedentary work. (R. 19). The ALJ opined that Plaintiff did not retain the RFC

to perform his past work. (R. 21). However, Plaintiff retained the RFC to perform a significant number of jobs in the regional economy. (R. 21). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 22).

**VI. Issues**

Plaintiff has essentially raised one issue. The issue is as follows:

**Whether the ALJ erred by failing to address Listing 1.03.**

In this case, Plaintiff argues that the ALJ's decision not to address Listing 1.03 was reversible error. Plaintiff claims that his hip impairment does, in fact, meet Listing 1.03, which provides as follows:

> 1.03 *Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint*, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.03. The "inability to ambulate effectively" is defined in Listing 1.00B2b, which explains:

> *b. What We Mean by Inability to Ambulate Effectively*
>
> (1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.,* an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) *To ambulate effectively,* individuals must be capable of sustaining a reasonable walking pace over a

> sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at Listing 1.00B2b. In order for an individual to be disabled under a particular listing, his impairment must meet each distinct element within the listing. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). And, it is important to remember that at step three, the burden rests on Plaintiff to demonstrate that he meets the listing.

While Plaintiff asserts that the ALJ erred by failing to address Listing 1.03, there is substantial evidence in the record that Plaintiff does not meet that listing because there is evidence that Plaintiff did not have the requisite inability to ambulate effectively. Even though the ALJ did not address Listing 1.03, he did address Listing 1.02 which is similar to Listing 1.03 in that: (1) it deals with the major dysfunction of a joint; and (2) it requires a finding of ineffective ambulation. The ALJ found that Plaintiff did not meet Listing 1.02A because he did not have an impairment that resulted in the inability to ambulate effectively. (R. 18). Substantial evidence in the medical record supports this conclusion. A physical therapy treatment note from January 29, 2007, indicated that Plaintiff

was able to walk with an antalgic gait and/or the use of one crutch. (R. 334). A physical therapy note from April 6, 2007, indicated that Plaintiff was able to walk with an antalgic gait, favoring his right side. (R. 310). Records from June 22, 2007, indicated Plaintiff recently had been feeling good enough to play basketball, and he had been able to walk his dog prior to a worsening in his pain symptoms. (R. 257). Records from Dr. Masini on August 14, 2007, reveal that Plaintiff enjoyed walking his dog, but that he was unable to do more than that due to his hip pain. (R. 360). On February 22, 2008, Dr. Masini noted that Plaintiff walked with a limp, but that he did not require any assistive device to ambulate. (R. 349). Dr. Masini indicated that Plaintiff was really doing quite well at that time. (R. 349). And finally, on April 23, 2008, Plaintiff presented to Dr. Masini and explained that he was very happy with how he felt at that time. (R. 347). Plaintiff reported that he was walking, that he was active, and that he was golfing. He stated that he was having no problems at all with his hip. (R. 347). Upon examination, Dr. Masini noted that Plaintiff had excellent motion in his hips and was doing well. (R. 347).

While there are certainly some instances in the record where Plaintiff was not able to ambulate without the use of two crutches, these instances primarily occurred immediately following one of Plaintiff's three surgeries on his hip and one surgery on his knee. In looking at the totality of Plaintiff's medical treatment history, there is substantial evidence to support the ALJ's conclusion that Plaintiff could ambulate effectively.

It is also important to recognize that Listing 1.03 is more demanding than Listing 1.02. Listing 1.03 not only requires a finding of an inability to ambulate effectively, but also requires a finding that, after an individual's reconstructive surgery, "return to effective ambulation did not occur, or is not expected to occur, within 12 months." Had the ALJ addressed this more demanding requirement, he would have found that it was not met. It appears that Plaintiff's first reconstructive surgery on his hip was performed on October 12, 2006. (R. 191-94). Plaintiff later underwent two more hip surgeries.[2] Plaintiff underwent a second hip surgery on September 27, 2007 (R. 354-56), and a third hip surgery on January 31, 2008 (R. 290-92). The record reflects that Plaintiff returned to effective ambulation within one year of the October 2006 surgery. For instance, records from June 2007 indicate Plaintiff recently had been feeling good enough to play basketball, and he had been able to walk his dog prior to a worsening in his pain symptoms (R. 257), and records from August 2007 reveal that Plaintiff enjoyed walking his dog, but that he was unable to do more than that due to his hip pain (R. 360). Additionally, there is substantial evidence that Plaintiff returned to effective ambulation within one year of his September 2007 and January 2008 hip surgeries. By April 2008, Plaintiff reported that he was walking, that he was active, and that he was golfing; he was having no problems at all with his hip. (R. 347). Therefore, there is substantial evidence that

---

[2]It is unclear whether or not these two additional surgeries constituted "reconstructive" surgeries. However, even crediting both as such, there is substantial evidence in the record that Plaintiff's second and third hip surgeries did not meet Listing 1.03.

-16-

Plaintiff was able to return to effective ambulation within one year of each of his three hip surgeries. In fact, there is substantial medical evidence that there was never an entire one-year period where Plaintiff was unable to ambulate effectively. Consequently, Plaintiff's impairment did not meet Listing 1.03.

In summary, the ALJ did not err by failing to address Listing 1.03 because the ALJ did address Listing 1.02 and both of these listings have the same requirement that an individual not be able to ambulate effectively. And, even if the failure to address Listing 1.03 was deemed to be an error, such an error was clearly harmless because the objective medical evidence reveals that Plaintiff was able to ambulate effectively within one year of each of his surgeries.

## VII. Conclusion

The ALJ did not err by failing to address Listing 1.03, so long as he evaluated the claim under Listing 1.02, although it certainly would have been better to have done so. This case does present a very young claimant with a very real and significant impairment. Another ALJ might have weighed the evidence of Plaintiff's impairments between his August 2006 diagnosis of avascular necrosis and his January 2008 hip resurfacing procedure in a different manner. Another ALJ may have found at least a closed period of disability for that time period. However, the court is not allowed to re-weigh the evidence or substitute its own judgment for that of the ALJ who conducted the review. There is substantial evidence to support the factual determination of the ALJ that

Plaintiff was able to ambulate effectively during a substantial part of the time period at issue. The final decision of the Commissioner is, therefore,

**AFFIRMED.**

**SO ORDERED** the 4th day of January, 2012.

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Larry J. Schad
SCHAD & SCHAD
lschad@schadlaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov